UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

KEZLYN MENDEZ,
    *Plaintiff*,

v.

PETER WITHERSPOON *et al.*,
    *Defendants*.

No. 3:19-cv-02001 (JAM)

**INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C § 1915A**

Plaintiff Kezlyn Mendez is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint under 42 U.S.C. § 1983 against numerous officials of the DOC. Mendez alleges that defendants used excessive force against him by spraying him with mace, putting him in a chokehold, and brutally beating him for no good reason. After an initial review in accordance with 28 U.S.C. § 1915A, I conclude that the complaint should be served on all named defendants in their individual capacities as set forth in the ruling below.

BACKGROUND

Mendez names twelve defendants in his complaint: Correction Officers Peter Witherspoon, Derek Glover, Anthony Jusseaume, David Evans, Joseph Ciesnik, Michael Nardone, Jonathan Peau, Marc Ayotte, Aaron Drake, and Michael Greene, and Lieutenants Daniel Potts and John Hackett. Doc. #1-1 at 1, 2-3 (¶¶ 4-5). The following facts as alleged in the complaint are accepted as true only for purposes of this ruling.

On December 29, 2017, while Mendez was incarcerated at Corrigan Correctional Center ("Corrigan"), he had a brief verbal altercation with Correction Officer Tadisco while he was waiting in line for his pain medication. *Id.* at 3 (¶¶ 6-10). The altercation began when Mendez passed a football pool to another prisoner, and Tadisco suggested it was a "love note." *Ibid.* (¶ 7).

1

Although Tadisco said she was joking, Mendez respectfully asked her not to joke with him like that because he is Muslim and "that's how rumors get started." *Ibid.* (¶¶ 7-8). This "agitated" Tadisco, and she ordered Mendez to return to his cell. *Ibid.* (¶¶ 9-10). Tadisco told him he would not receive his medication and mocked him while escorting him to his cell. *Ibid.* (¶ 10).

While Mendez was walking to his cell, defendants Witherspoon and Glover cornered him against a wall and "aggressive[ly]" asked what his problem was with "the lady" (presumably referring to Tadisco). *Id.* at 3-4 (¶ 11). Glover reached out to grab Mendez's arm, but Mendez moved it, explaining that Tadisco was refusing to allow him to get his "much needed" pain medication because he disliked her joke. *Id.* at 4 (¶ 12). Witherspoon told Mendez that they were going to teach him "how we do it up here." *Ibid.* (¶ 13). Mendez asked Witherspoon to stop threatening him, but Glover said that they were going to "beat some sense" into him. *Ibid.* (¶ 14).

Fearing for his safety, Mendez began to move away from Witherspoon and Glover and removed his glasses in anticipation of an attack. *Ibid.* (¶¶ 15-16). At this point, one of the officers said they were going to "kill you nigger." *Ibid.* (¶ 16). Mendez again asked the officers to stop threatening him and assumed a protective stance as Witherspoon began walking toward him, shaking a can of mace. *Ibid.* Witherspoon then sprayed Mendez in the face. *Ibid.* At the same time, someone punched Mendez in the stomach, causing him to fall to the ground. *Ibid.*

Defendant Jusseaume put Mendez in a chokehold, *id.* at 10 (¶ 53), which restricted his breathing, while Witherspoon, Glover, and defendant Evans punched and kneed him in his face, head, body, and genitals. *Id.* at 4-5 (¶ 17), 11 (¶¶ 57-58). Defendants Potts and Hackett, *id.* at 10 (¶ 52), and defendants Ciesnik, Nardone, Peau, Ayotte, Drake, and Greene, *id.* at 12 (¶ 62), responded to the incident. All the responding officers stood by and watched while Mendez, on the floor, in restraints, and not resisting, was beaten. *Id.* at 5 (¶ 17).

Mendez lost consciousness for a time, but he was awakened by more punches to his face and head. *Ibid.* (¶ 18). At this point, Mendez could not see who was punching him because the mace blinded him and his eyes were either completely or partially swollen shut. *Ibid.* Both of his lips were split open and bleeding. *Ibid.* (¶ 19). A spit bag was eventually placed on his head because he was choking from the mace. *Ibid.*

Mendez was taken to the medical unit, and the nurse immediately called the doctor, who determined that Mendez needed more extensive treatment than could be provided at the facility. *Ibid.* (¶ 20). After Mendez showered, but before he was given an opportunity to "properly decontaminate" from the mace exposure, defendant Potts and two correction officers transported him to Backus Hospital in Norwich. *Ibid.* (¶¶ 21-22). There, a doctor ordered a CT scan of Mendez's face and head, and provided Mendez with pain medication. *Id.* at 5-6 (¶¶ 23-24). The doctor decided that Mendez's bottom lip should be left to heal on its own and recommended a soft food or liquid diet until his mouth healed and the jaw pain and swelling decreased. *Id.* at 6 (¶ 24). He also recommended that Mendez be closely supervised per the concussion protocol. *Ibid.* Mendez was discharged with two types of pain medication. *Id.* at 6 (¶ 25).

Mendez was then taken to Northern Correctional Institution ("Northern") pending his placement in administrative segregation. *Ibid.* (¶ 26). There, he was periodically assessed and given pain medication, and was also placed on a soft-food and then a liquid diet. *Id.* at 7 (¶¶ 30-31). Mendez constantly complained of pain in his right forearm, jaw, and left eye as well as headaches. *Ibid.* (¶ 32). The facility doctor ordered that he be taken to the University of Connecticut Health Center ("UConn") emergency room for evaluation and treatment. *Ibid.*

On December 31, 2017, Mendez underwent a second CT scan at UConn. *Ibid.* (¶ 33). An ophthalmologist evaluated Mendez's complaints of pain and vision loss in his left eye, which

was still swollen shut, and concluded that Mendez's vision would return to normal with time. *Ibid.* (¶¶ 34-35). Mendez was discharged with a follow-up appointment to be held in two-to-three weeks. *Ibid.* (¶¶ 35-36). Mendez returned to his cell where he was provided pain medication and observed in accordance with the concussion protocol. *Id.* at 8 (¶¶ 37, 39).

Sometime after January 2, 2018, Mendez requested that the video surveillance footage of the December 2017 assault be preserved, and he filed a grievance about the assault. *Ibid.* (¶¶ 38, 40). On February 7, 2018, the grievance was compromised—*i.e.*, it was found to have "sufficient merit that some modification of the existing decision is warranted"—and the footage was sent to the district administrator for review. *Ibid.* (¶ 40).[1]

Mendez began experiencing swelling of his genitals, for which he was seen at a sick call and prescribed medication. *Ibid.* (¶ 41). On January 17, 2018, Mendez returned to the UConn ophthalmologist, who said that the blows Mendez suffered had caused a subconjunctival hemorrhage in his left eye but that his vision would fully return. *Ibid.* (¶ 42). After Mendez returned to Northern, the facility doctor checked on him until he was transferred to MacDougall-Walker Correctional Institution ("Walker"). *Id.* at 9 (¶ 43).

From January to August 2018, Mendez submitted inmate requests complaining of headaches and vision problems. *Ibid.* (¶ 44). APRN LaFrance eventually prescribed him blood pressure medication. *Ibid.* Mendez filed additional requests and grievances regarding the December 2017 assault. *Ibid.* (¶¶ 45-46). Mendez's second grievance was compromised, and he was notified that, as of October 2018, the assault was still being investigated. *Ibid.* (¶ 47).

On December 23, 2019, Mendez filed this complaint alleging Eighth Amendment claims of excessive force and failure to intervene against the defendants in their individual and official

---

[1] Connecticut State Department of Correction, Administrative Directive 9.6 (Inmate Administrative Remedies), https://portal.ct.gov/DOC/AD/AD-Chapter-9 [https://perma.cc/8WRN-6U8M] (last visited Apr. 19, 2020).

capacities. *Id.* at 2-3 (¶¶ 1, 4-5), 10-12 (¶¶ 52-63), 14. He seeks compensatory and punitive damages. *Id.* at 12-13.

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint —(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a pro se complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See*, *e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

The Eighth Amendment protects prisoners from "cruel and unusual punishments." U.S. CONST. amend. VIII. "Although not every malevolent touch by a prison guard gives rise to a federal cause of action, inmates have the right to be free from the unnecessary and wanton infliction of pain at the hands of prison officials." *Hogan v. Fischer*, 738 F.3d 509, 515 (2d Cir. 2013) (internal quotations and citations omitted). In order to state an Eighth Amendment claim

for the use of such excessive force, an inmate must allege (1) a sufficiently serious use of force (2) that has been inflicted for malicious or sadistic reasons rather than in a good-faith effort to maintain or restore discipline. *See Harris v. Miller*, 818 F.3d 49, 63-64 (2d Cir. 2016) (*per curiam*). The "'malicious use' of more than *de minimis* force 'to cause harm' is a *per se* violation of the Eighth Amendment." *Fabricio v. Annucci*, 790 F. App'x 308, 310 (2d Cir. 2019) (quoting *Harris*, 818 F.3d at 63). Liability can stem from an officer using excessive force him or herself, or from not intervening when in a position to observe the conduct and with time to intervene. *See Sloley v. VanBramer*, 945 F.3d 30, 46-47 (2d Cir. 2019).

Mendez has clearly stated plausible Eighth Amendment claims against the defendants. As the facts are alleged in Mendez's complaint and which I have to assume to be true at this initial pleading stage, defendants Jusseaume, Witherspoon, Glover, and Evans cornered Mendez, sprayed him with mace, put him in a chokehold, and brutally beat him to the point where he lost consciousness and was left temporarily blind and in significant pain for weeks on end. There was no apparent justification for this use of force other than perhaps to defend the honor of "the lady" Correction Officer Tadisco. Mendez displayed no threatening or disobedient behavior other than to assume a defensive stance after the defendants threatened him with violence. Even when Mendez was on the floor, in restraints, and unconscious, these defendants made no attempt to temper the force used. Although the remaining eight defendants responded to the incident and could have intervened to minimize or cut off the onslaught, they stood by and did nothing while the thrashing of Mendez's inert body continued.

Because Mendez is seeking only damages for relief, the state-employee defendants are immune from his official capacity claims. *See Kentucky v. Graham*, 473 U.S. 159, 165-66

(1985). Accordingly, I will dismiss all official capacity claims against defendants and permit only the claims against defendants in their individual capacities to proceed.

## CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

1. Mendez's Eighth Amendment claims for excessive force and failure to intervene may proceed against all named defendants in their individual capacities.

2. The Court DISMISSES all official capacity claims against the defendants pursuant to 28 U.S.C. § 1915A(b)(2).

3. The Clerk shall verify the current work addresses for the above-named defendants with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to those defendants at the confirmed addresses **within twenty-one (21) days of this Order**, and report to the Court on the status of the waiver requests by not later than **the thirty-fifth (35) day after mailing**. If any defendant fails to return the waiver request, the Clerk shall arrange for in-person service by the U.S. Marshal Service on that defendant, and that defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

4. All defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60) days** from the date the notice of lawsuit and waiver of service of summons forms are mailed to them.

5. The Clerk shall send a courtesy copy of the complaint and this Order to the DOC Office of Legal Affairs.

6. The discovery deadline is extended to **six months (180 days) from the date of this Order**. The parties must comply with the District of Connecticut "Standing Order Re: Initial Discovery Disclosures" which the Clerk must send to plaintiff with a copy of this order. The order also can be found at http://ctd.uscourts.gov/district-connecticut-public-standing-orders. Note that discovery requests should not be filed with the Court. In the event of a dispute over discovery, the parties should make a good faith effort to resolve the dispute amongst themselves; then, the parties should file the appropriate motion to compel on the docket.

7. The deadline for summary judgment motions is extended to **seven months (210 days) from the date of this Order**.

8. Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to a dispositive motion (*i.e.*, a motion to dismiss or a motion for summary judgment) **within twenty-one (21) days of the date the motion was filed**. If no response is filed, or the response is not timely, the Court may grant the dispositive motion without further proceedings.

9. If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that he **MUST** notify the court. Failure to do so may result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. He should write PLEASE NOTE MY NEW ADDRESS on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If Plaintiff has more than one pending case, he must indicate all of the case numbers in the notification of change of address. Plaintiff must also notify defendants or defense counsel of his new address.

10. Plaintiff shall utilize the Prisoner E-Filing Program when filing documents with the Court. Plaintiff is advised that the Program may be used only to file documents with the Court. As discovery requests are not filed with the Court, the parties must serve discovery requests on each other by regular mail.

It is so ordered.

Dated at New Haven this 20th day of April 2020.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge